SEALED

# United States District Court

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
March 16, 2015

CLERK, U.S. DISTRICT COURT
By_____
Deputy

**NORTHERN** _____ **DISTRICT OF** _____ **TEXAS** _____

In the Matter of the Seizure of

All funds contained in and deposited into
Account #XXXXXXXX5218 in the name of
KHI Medical Solutions Inc. at Bank of
America, NA, for a period of fourteen (14)
calendar days from the time of service of this
warrant

**APPLICATION AND AFFIDAVIT FOR
SEIZURE WARRANT**

**CASE NUMBER:** 3:15-MJ-168 BK

**I, Chris Woolbright, being duly sworn depose and say:**

**I am a Special Agent with Drug Enforcement Administration, and have reason to believe that in the Northern District of Texas or elsewhere in the United States there is now certain property which is subject to forfeiture in the United States, namely:**

All funds contained in and deposited into Account #XXXXXXXX5218 in the name of KHI Medical Solutions Inc. at Bank of America, NA, for a period of fourteen (14) calendar days from the time of service of this warrant

**I believe that the property described is subject to seizure and that grounds exist for the issuance of this seizure warrant pursuant to 18 U.S.C. § 981(b) / 21 U.S.C. § 881(b) concerning property subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and 21 U.S.C. § 881(a)(6). The facts to support a finding of probable cause are as follows:**

See attached affidavit

**Continued on the attached sheet and made a part hereof.** __X__ **Yes** _____ **No**

_____
**Signature of Affiant**

**Sworn to before me, and subscribed in my presence**

at **Dallas, Texas**
City and State

**Date: March 16, 2015**

**Renée Harris Toliver**
**United States Magistrate Judge**

_____
**Signature of Judicial Officer**

## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEIZURE WARRANTS

I, Chris D. Woolbright, being duly sworn, state as follows:

### AFFIANT'S BACKGROUND

1.      I am employed as a Special Agent with the Drug Enforcement Administration and have been so employed for approximately 18 years.  Pursuant to 21 U.S.C. § 878, I am authorized to conduct searches and seizures on behalf of the DEA.  During my years as a law enforcement officer, I have had training and experience conducting a variety of investigations, including complex criminal conspiracies involving large scale trafficking of illicit substances such as marijuana, cocaine, methamphetamine, and heroin, as well as cases involving the diversion of legal pharmaceutical controlled substances into the illicit market.  The methods employed and techniques utilized throughout these investigations include electronic and physical surveillance, pen registers, Title III electronic interceptions, undercover operations, utilization of grand jury and administrative subpoenas, and the use of confidential informants.  During my tenure with the DEA, I have also received extensive training into the tracing of illicit drug proceeds into the banking system, as well as the laundering of these proceeds.  This affidavit is the result of an extensive investigation conducted by myself, other agents and investigators.  It does not purport to share all of my knowledge about this case, only sufficient evidence to support the seizure of property.

1

## PROPERTY FOR SEIZURE

2.      This affidavit is made in support of seizure warrants for the following property:

      a.      All funds contained in and deposited into Account #XXXXXXXX5205 in the name of KHI Medical Solutions Inc. at Bank of America, NA, for a period of fourteen (14) calendar days from the time of service of this warrant.

      b.      All funds contained in and deposited into Account #XXXXXXXX5218 in the name of KHI Medical Solutions Inc. at Bank of America, NA, for a period of fourteen (14) calendar days from the time of service of this warrant.

## LEGAL AUTHORITY FOR SEIZURE

3.      Based upon my experience and the information contained in the subsequent paragraphs, I have probable cause to believe that the property described in paragraph 2 is subject to civil forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it was furnished or intended to be furnished by any person in exchange for a controlled substance in violation of 21 U.S.C. §§ 841 and/or 846; is the proceeds traceable to such an exchange; and/or was used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846. Also, based upon my experience and the information contained within the subsequent paragraphs, I have probable cause to believe that the property described in paragraph 2 is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it is property involved in, or traceable to property involved in, a violation of 18 U.S.C. §§ 1956 and/or 1957.

4.      18 U.S.C. § 984 provides that, in any forfeiture action *in rem* in which the subject property is funds deposited into an account in a financial institution, the government does

2

not have to identify the specific funds involved in the offense that is the basis for the forfeiture; it is no defense that those funds have been removed and replaced by other funds; and identical funds found in the same account as the funds involved in the forfeiture offense are subject to forfeiture. In essence, § 984 allows the government to seize for forfeiture identical property found in the same place where the "guilty" property has been kept. However, § 984 does not allow the government to reach back in time for an unlimited period; a forfeiture action (including a seizure) against property not directly traceable to the offense that is the basis for the forfeiture cannot be commenced more than a year from the offense date.

## PROBABLE CAUSE FOR SEIZURE

5.      This affidavit is intended to show there is sufficient probable cause for the issuance of a seizure warrant and does not set forth all of my knowledge about this matter. The facts in this affidavit come from my personal observations; my training and experience; and information obtained from other investigators, task force officers, agents, and witnesses involved or connected with this investigation.

6.      Based upon the following information, there is probable cause to believe that Muhammad Faridi, owner of KHI Medical Solutions Inc., and other individuals are currently involved in a scheme to distribute controlled substances not for a legitimate medical purpose and outside the scope of professional medical practice in violation of the following provisions of federal law:

    (a) 21 U.S.C. § 841(a)(1), specifically, to distribute or dispense, or possess with the intent to distribute or dispense a controlled substance, namely

3

oxycodone, a Schedule II controlled substance, not for a legitimate medical purpose and outside the scope of professional practice;

(b)  21 U.S.C. § 841(a)(1), specifically, to distribute or dispense, or possess with the intent to distribute or dispense a controlled substance, namely hydrocodone, a Schedule III controlled substance, not for a legitimate medical purpose and outside the scope of professional practice; and

(c)  21 U.S.C. § 846, specifically, to conspire to distribute or dispense a controlled substance, namely oxycodone, a Schedule II controlled substance and Hydrocodone, a Schedule III controlled substance, not for a legitimate medical purpose and outside the scope of professional practice.

7.    In addition to the aforementioned offenses, there is also probable cause to believe that Muhammad Faridi and other individuals are engaging in money laundering, in violation of 18 U.S.C. §§ 1956 and/or 1957.

## THE CRIMINAL SCHEME

8.    Since May 2013, the DEA Dallas Field Division's Tactical Diversion Squad has been conducting an investigation into the criminal activities of Muhammad Faridi, Dr. Richard Andrews, Fahim A. Khan, Tariq A. Campbell, and others involved in a large scheme to obtain and distribute oxycodone and hydrocodone not for a legitimate medical purpose and outside the scope of professional medical practice.  The activities of Muhammad Faridi and the others are centered at the McAllen Medical Clinic, 4373 S. Hampton Road, Dallas, Texas.

4

9.      Thus far, the investigation has revealed a sophisticated criminal scheme to distribute pharmaceutical controlled substances in which individuals, often homeless or indigent, are recruited to go to specified clinics such as McAllen to obtain prescriptions for oxycodone and hydrocodone.  Several recruiters have been identified, including Tariq Campbell and Cornelius Robinson.  These recruiters facilitate the location/organization of "patients" (including recruiting at various homeless shelters and other places), as well as the preparation and/or obtaining of fictitious medical charts in the name(s) of the "patients."  Recruiters also coordinate the transportation of "patients" and their appointment times at various clinics, including McAllen.  The recruiters also facilitate the filling of the prescriptions at complicit pharmacies, including Genpharm Pharmacy in Dallas, Texas and Cornerstone Pharmacy in Desoto, Texas.  The recruiters typically pay the "recruits" a small fee consisting of $30-$70, and the drugs are ultimately turned over to the driver/recruiter to be sold to individuals for as much as $30 per pill.  It is my belief, based on information gleaned thus far from this investigation, that the illicitly-obtained controlled substances are sold in places as far away as Chicago, Illinois, Baton Rouge, and Louisiana.

10.     On May 21, 2013, DEA Investigator Susannah Herkert spoke with Sonja Shannon, a former nurse practitioner who had been employed at the McAllen Medical Clinic from 2012 through 2013.  Shannon stated that she answered an online posting for a nurse practitioner in November 2012 at the McAllen Medical Clinic, located in Lewisville, Texas at that time.  Shannon stated that she met with two individuals - Muhammad Faridi and a relative of Muhammad Faridi named Khan.  Shannon indicated that Dr. Richard

Andrews was the supervising physician, but that she did not meet him prior to becoming employed at the clinic. Shannon stated that, shortly after beginning work at McAllen, she noticed the same familiar faces hanging around the office and conversing with staff. Shannon indicated that sometime thereafter she noticed that medical records brought in by the patients associated with these individuals were bogus. Shannon stated that she tried to call the numbers on some of the MRI reports, only to find that they either didn't exist or that the MRI location had never heard of the particular patient. Shannon stated that she reported these incidents to Dr. Andrews, who seemed not to be bothered by this revelation. Shannon also stated that during this time, her sister, who was also employed at the clinic, shared concerns about passenger vans dropping off patients at the clinic in large numbers. Shannon stated that the clinic relocated to its present location on Hampton Road in Dallas in December 2012, because other tenants at the Lewisville location were complaining about the traffic in and out of the clinic. Shannon stated that she rarely saw Andrews at the clinic during this time and that he only came there in the evenings and weekends.

11.    On June 13, 2013, DEA Investigator Herkert reviewed data from the Texas Prescription Monitoring Program, which is maintained by the Texas Department of Public Safety (DPS). Texas law mandates that all pharmacies must report prescriptions filled by the pharmacy in Schedules II thru V, providing the patient's name and address, as well as the prescriber's name and address. The information reviewed was relevant to prescriptions written by Dr. Richard Andrews for controlled medications. According to the information, from February 2013 through May 2013 Dr. Andrews, through the

McAllen Medical Clinic, had written prescriptions for over 52,000 dosage units of oxycodone; this number was over 54% of all of the controlled prescriptions written by Andrews. The street value of this medication was well over $1,500,000.00. In addition, the top two controlled substances prescribed by Andrews were oxycodone and hydrocodone, totaling 78% of his overall controlled substance prescriptions. While 76% of the hydrocodone prescriptions were for the highest strength available (10 mg), 100% of the oxycodone prescriptions were for one formulation (30 mg). DEA Investigator Herkert categorized this prescription history as highly unusual, given the sheer volume of medications prescribed in such a short period of time and the fact that Andrews is not licensed in Texas as a pain management specialist.

12.     On or about August 2, 2013, the DPS received an e-mail from Anderson Wallace, a security guard working for Top Gun Security at McAllen Medical Clinic. Top Gun Security had been contracted by Muhammad Faridi to provide security services for the clinic. Mr. Anderson detailed that, from his second day on the job at McAllen, he witnessed drug transactions in the parking lot and the exchange of money in his presence between Tariq Campbell and other individuals. Anderson stated that approximately one week later, "Mr. Muhammad" (believed to be Muhammad Faridi) told him that he had contracted Campbell for transport services and he could subcontract whoever he chooses. Anderson indicated that he attempted to tell Muhammad about the suspicious activity but that he (Faridi) would not "indulge the notion." Anderson said a week later he noticed that Campbell would arrive with five to six other vehicles containing "homeless people or those in a shelter." Anderson stated that Muhammad (Faridi) would

7

then provide Campbell a prescription for each of the individuals.  Anderson also indicated that the activity occurred at the clinic on a daily basis.   Anderson stated that his contract was terminated after he noticed a suspicious vehicle parked nearby and questioned whether somebody could be "watching the clinic."  Anderson stated that this prompted an employee of the clinic to ask Muhammad if she could leave work.

13.     On November 14, 2013, physical surveillance was conducted at the Cornerstone Pharmacy located at 2707 Bolton Boone Road, in Dallas, Texas.   I, along with DEA Special Agents Byron Wells and Chris Woolbright, observed Tariq Campbell travel from Cornerstone Pharmacy to a Hyatt House Hotel in Dallas, Texas, where he met with an individual later identified as Cy Viator.  Campbell and Viator then traveled to a FedEx pack/ship location at 1625 W. Mockingbird Lane, Suite 211 in Dallas, Texas, where Campbell exited the vehicle carrying a back pack and entered the business.  After being provided addresses in Lafayette, Louisiana and Austin, Texas to which to ship packages, Campbell mailed packages to the addresses.   After Louisiana State Police obtained a warrant to search the packages shipped by Campbell to Lafayette, the officers found 2,000 tablets of oxycodone and 500 tablets of hydrocodone (street value between $40,000.00 and $50,000.00).  The pill bottles recovered by the police listed the prescribing physician as Dr. Richard Andrews.

14.     On February 24, 2014, a phone call between Cornelius Robinson, a recruiter associated with Tariq Campbell, and Thuy Hong Le, an associate of Robinson operating in and around the Houston, Texas area, was intercepted by DEA, pursuant to a Title III order.  During the course of the call, Robinson bragged to Le that Muhammad (believed

to be Muhammad Faridi) provided Campbell with 53 schedule III prescriptions and 16 schedule II prescriptions to fill. During the call, Le and Robinson also discussed where Campbell was going to get that quantity of medication filled.

15.    On March 6, 2015, Diversion Investigator Joel L. Dunn and I spoke with Tariq Campbell at the DEA Dallas Field Division about his role in the McAllen-centered drug organization. According to Campbell, he was introduced to Muhammad Faridi by Fahim Khan and Deon Dickson around January 2013; the purpose of the introduction was to facilitate prescriptions for oxycodone and hydrocodone to "recruits" that Campbell was to bring to Faridi's McAllen Medical Clinic. Campbell indicated that he paid Faridi $600.00 to $700.00 cash directly for each illicit prescription for oxycodone or hydrocodone, which consisted of approximately 90 – 100 dosage units. Campbell indicated that this criminal arrangement lasted through August 2014. In August 2014, DPS representatives came to inquire about two prescriptions written to Cy Viator. Campbell indicated that at the peak of their agreement, Faridi would provide 15 prescriptions per day for approximately 4 days each week (approximately 6,000 dosage units). Campbell indicated that he would then fill the prescriptions at a complicit pharmacy and then sell the pills for $15.00 to $35.00 each, depending upon his location. Campbell estimated that he paid Faridi well over $200,000.00 for all the prescriptions.

16.    According to the Texas Secretary of State, Muhammad Faridi is the Director and President of KHI Medical Solutions Inc., a corporation initiated through the Texas Secretary of State in September 2012. Additionally, Faridi shows to be a Managing Member and Registered Agent for other Texas limited liability companies, including KHI

9

Property Management, LLC; KHI Home Health Services, LLC; and KHI Practice Management, LLC. Each of these companies lists its address as 4373 S. Hampton Road, Dallas, Texas (the address for McAllen Medical Clinic). According to the Texas Workforce Commission, no wages were reported for Faridi or for his business entities.

## FINANCIAL ACTIVITY RELATED TO THE CRIMINAL SCHEME

17. During this investigation, DEA Diversion Investigator Joel L. Dunn reviewed records for bank accounts controlled by Faridi, including three accounts at Bank of America, NA. - business account #XXXXXXXX5205 in the name of KHI Medical Solutions, Inc. ("BOA5205"); business account ##XXXXXXXX5218 in the name of KHI Medical Solutions, Inc. ("BOA5218"); and personal checking account #XXXXXXXX2691 in the name of Muhammad Faridi ("BOA2691"). The business accounts' signature cards show only Faridi as signatory for these accounts. An analysis of these three accounts utilizing a basic deposit/expenditure method was conducted for January 2013 through February 2014.

18. BOA5205 was originally opened with a $100 cash deposit in January 2013. Within 30 days of its opening, BOA5205 received more than $33,000.00 in three cash transactions. In March 2013, an additional $39,400.00 in cash was deposited into BOA5205 in six transactions. Over the next several months (through February 2014), more than $267,000.00 in cash was deposited into BOA5205. Several of the cash deposits occurred on the same or consecutive days in whole-dollar amounts under $10,000.00. In at least one instance, two deposits of $7,500.00 were made into BOA5205 on the same day (March 15, 2013) at two different branch locations, with a third

$7,500.00 cash deposit into BOA2691. In addition, numerous cash deposits in amounts under the reporting requirement (more than $10,000.00) were noted on consecutive days. Checks written by Dr. Richard Andrews or cashier's checks authorized from financial accounts controlled by Dr. Andrews were also deposited into BOA5205; these deposits totaled $468,000.00. From January 2013 through February 2014, over $875,000.00 was deposited into BOA5205.

19. Over $345,000.00 was deposited into BOA5218 from January 2013 through February 2014; $174,000.00 was in cash. As with BOA5205, several of the cash deposits were on the same or consecutive days. In addition, over $93,300.00 was transferred into BOA5218 from BOA5205. Cashier's checks totaling over $29,900.00 from Dr. Andrews were deposited into BOA5218.

20. In summary, Faridi deposited more than $440,000.00 in cash and close to $500,000.00 in check payments from Dr. Andrews into BOA5205 and BOA5218 in a 14-month period (January 2013 thru February 2014).

21. Through my training and experience, I know that medical facilities and/or medical clinics are not cash-intensive businesses. In fact, most monies paid to these types of businesses are insurance payments and, to a lesser extent, co-payments made by insured individuals in amounts ranging from $10 to $35. Even then, most individuals making co-payments do so by debit and/or credit cards, thus limiting the amount of cash any medical clinic would handle in any given day. From my training and experience, I also know that medical clinics which operate on a cash-only basis do so because of the scrutiny they face

11

by insurance companies who monitor payments to them and question medical and drug necessity.

## CONCLUSION

22.    Based upon my training, experience, and the preceding facts, I have probable cause to believe that the property described in paragraph 2 was furnished or intended to be furnished by any person in exchange for a controlled substance in violation of 21 U.S.C. §§ 841 and/or 846; is the proceeds traceable to such an exchange; and/or was used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.  Further, based upon my training, experience and the preceding facts, I have probable cause to believe that the property described in paragraph 2 was involved in, or traceable to property involved in, violations of 18 U.S.C. §§ 1956 and/or 1957.  I therefore have probable cause to believe that the property identified in paragraph 2 is subject to civil forfeiture pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(A) and request seizure warrants for that property, pursuant to 18 U.S.C. § 981(b) and 21 U.S.C. § 881(b).

23.     Since this investigation is continuing, disclosure of the seizure warrants, their applications, and the affidavit attached to theirs application will seriously jeopardize the progress of the investigation and, most importantly, the safety of Tariq Campbell, who is cooperating with the DEA while continuing to meet with Faridi.  Accordingly, I respectfully ask the court to issue an order that the seizure warrants, affidavits, and applications attached be filed under seal until further order of the court.

Chris Woolbright
Special Agent, DEA

Subscribed and sworn before me this _____16th_____ day of ___March___, 2015.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF TEXAS

13